UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PAUL J. FROMMERT, et al.,


                              Plaintiffs,

                                                    DECISION AND ORDER

                                                    00-CV-6311L


                    v.

SALLY L. CONKRIGHT, PATRICIA M. NAZEMETZ
AND LAWRENCE M. BECKER, XEROX CORPORATION
RETIREMENT INCOME GUARANTEE PLAN
ADMINISTRATORS AND XEROX CORPORATION
RETIREMENT INCOME GUARANTEE PLAN,


                              Defendants.
_____


## INTRODUCTION


        This decision constitutes the latest chapter in a long-running dispute between employees

of Xerox Corporation and administrators of Xerox's retirement plan, the Xerox Corporation

Retirement Income Guarantee Plan ("the Plan"), concerning calculation of retirement benefits.

The dispute involves a relatively small group of employees who previously left employment at

Xerox, received a lump-sum distribution upon their initial departure, and then were rehired by

Xerox years later.  Those employees are now contemplating retirement, or have retired, and the

issue in dispute is how their present retirement benefits should be calculated.

With respect to this group of rehired employees, the Plan is designed so that an employee's total years of employment at Xerox, regardless of whether there was a break in service, are counted in calculating the employee's retirement benefits.  Generally, the relevant pension calculations are based on the employee's total years of employment times a percentage of the employee's five highest-paying calendar years with Xerox.  Both sides in this litigation agree that to avoid duplication of benefits, some sort of offset against current benefits is necessary to reflect the employee's receipt of monies at the time of the prior separation from employment.  Just how that offset against current benefits should be calculated, though, has been a matter of much dispute and has engendered a great deal of litigation.

Familiarity with this Court's several prior decisions involving these parties, *see* 328 F.Supp.2d 420 (W.D.N.Y. 2004); 206 F.Supp.2d 435 (W.D.N.Y. 2002), and also the Second Circuit's decision of January 6, 2006, 433 F.3d 254 ("Second Circuit decision") is presumed. These decisions set out in great detail the relevant facts and disputed issues between the parties. There is, therefore, no need to restate those matters here.

The Second Circuit decision, which was on an appeal from two of this Court's prior decisions dismissing some of plaintiff's claims and granting summary judgment in favor of defendants on the remaining claims, resolved many of the issues raised between the parties.  The Second Circuit affirmed in part, reversed in part, and remanded the case to this Court for further proceedings.

The Second Circuit held that the Plan's use of a so-called phantom account in determining present benefits violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*, in several respects.  First, the Plan's formula constituted a "retroactive cut-back" of benefits, 433 F.3d at 268, contrary to § 204(g) of ERISA.  In addition, the court found that employees were not given proper notice in the Summary Plan Description ("SPD") of the nature and scope of the phantom account, at least prior to 1998, when the SPD was amended to include the phantom account and describe the offset procedure.  *Id.* at 263, 269.

The Second Circuit determined that employees rehired after 1998 had sufficient notice as to the manner by which Xerox intended to treat their previous distribution.  For those rehired prior 1998, though, the Second Circuit remanded to this Court and directed me to "utilize an appropriate pre-amendment [1998] calculation," *id.* at 268, without using the "phantom account," to determine current benefits.

Specifically, the Second Circuit directed as follows:

> On remand, the remedy crafted by the district court for those employees rehired prior to 1998 should utilize an appropriate pre-amendment calculation to determine their benefits.  We recognize the difficulty that this task poses because of the ambiguous manner in which the pre-amendment terms of the Plan described how prior distributions were to be treated.  As guidance for the Court, we suggest that it may wish to employ equitable principles when determining the appropriate calculation in fashioning the appropriate remedy.

*Id.*

Subsequent to the Second Circuit's decision, the Court met with counsel to determine how best to proceed.  The parties agreed to work together to see if they could resolve the issues

remaining on remand.  Although the parties appear to have spent some time attempting to reach a settlement, it is now apparent that they are unable, or unwilling, to settle.

The Court conducted a two-day hearing on the remedial issues raised by the Second Circuit and has received both pre-hearing and post-hearing memoranda from both sides.  The parties have also discussed several cases from other jurisdictions dealing with similar issues.  Having considered both sides' submissions and arguments, the Court now issues this Decision and Order concerning the issues before it on remand.

<b>DISCUSSION</b>

**I. The Appropriate Calculation of Plaintiffs' Benefits**

This Court's task on remand is made easier in many respects by the breadth of the Second Circuit decision.  The Circuit resolved many issues and has clearly established the law of the case in many respects.  For example, it can no longer be disputed that employees were not give proper notice in either the Plan or the relevant SPD as to the nature of the phantom account and its operation.  Utilization of this phantom account or anything similar to it has been soundly rejected by the Court of Appeals in this case as well as a previous case involving the same Plan, *Layaou v. Xerox Corporation*, 238 F.3d 205 (2d Cir. 2001).  Other courts have reached the same conclusion.  *Miller v. Xerox Corp. Ret. Income Guarantee Plan*, 464 F.3d 871 (9th Cir. 2006); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003).  It is clear,

then, that Xerox may not lawfully use the phantom account mechanism, as to either the named plaintiffs in this lawsuit, or anyone else who was rehired by Xerox prior to 1998, after having previously received a distribution of pension benefits.  The Second Circuit has addressed this issue more than once, and Xerox may not continue to utilize this rejected formula.

The Second Circuit also rejected Xerox's contention that a procedure utilizing a phantom account has always been a part of the Plan, even prior to 1998.  433 F.3d at 256.  The Circuit determined that Xerox's use of the phantom account constituted a retroactive diminution of benefits, contrary to the law.  *Id.* at 268.  Furthermore, the Court of Appeals rejected Xerox's contention that it had properly amended the Plan and notified the Plan's participants concerning utilization of the phantom account, prior to 1998.  *Id.* at 263.

Although the Circuit clearly precluded use of the phantom account in determining how to treat prior distributions, it did little to elucidate what formula *should* be adopted, except to suggest using an "appropriate pre-amendment calculation" guided by equitable principles in determining the appropriate remedy for affected employees.  *Id.* at 268.

The problem is that if one removes the phantom account mechanism, there is little else remaining.  The Circuit expressly recognized this by noting the "difficulty" confronting the district court "because of the ambiguous manner in which the pre-amendment terms of the Plan described how prior distributions were to be treated."  *Id.* at 268.

Describing the procedures to be utilized prior to the 1998 amendments as "ambiguous" is generous.  In fact, virtually nothing is set forth in either the Plan or the SPD as to the precise

mechanism for taking into account a prior distribution in calculating an employee's present benefits after a rehire.

Some testimony at the hearing before me focused on the appropriate economic, financial and actuarial methods for treating prior distributions.  But this Court is not charged with writing a sound retirement plan.  Rather, I must interpret the Plan as written and consider what a reasonable employee would have understood to be the case concerning the effect of  prior distributions.  If the employee had no notice of the "phantom account," he also had no notice of some of the other mechanisms suggested by witnesses at the remand hearing before me.  What is "best" from a financial or actuarial point of view is not what the Court has been charged with determining. The Court's task, as directed by the Court of Appeals, is simply to determine, based on the language of the Plan and the SPD, what benefits are now due this group of rehired employees.

To the extent that there is some ambiguity as to the precise manner by which prior distributions are to be offset from present benefits, it is Xerox, not the employees, who should suffer.  *See Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 113 (2d Cir. 2003) ("The consequences of an inaccurate SPD must be placed on the employer").  It was defendants' obligation to provide a clear description, in the SPD and in the Plan itself, as to how those prior distributions would be treated.  To the extent that the Plan was constituted, at Xerox's doing, to consider all prior years of service, defendants had the burden of elucidating precisely how that would be accomplished.

As noted by the Court of Appeals in this case, 433 F.3d at 258, the Plan does have a provision, § 9.6, dealing with "nonduplication of benefits."  That section provides as follows:

> *Nonduplication of Benefits.* In the event any part of or all of a Member's accrued benefit is distributed to him prior to his Normal Retirement Date, if Section 8.8 [dealing with incompetent beneficiaries] does not apply to such distribution and such Member at any time thereafter recommences active participation in the Plan, the accrued benefit of such Member based on all Years of Participation shall be offset by the accrued benefit attributable to such distribution.

"Accrued benefit," as used in § 9.6, is defined at § 1.1 as follows:

> The normal retirement benefit which a Member has earned up to any date, and which is payable at Normal Retirement Date in an amount computed in accordance with Section ... 4.3 [which sets forth the general method for calculating the normal retirement benefit], based, however, only upon Average Monthly Compensation received and Years of Participation rendered by a Member up to the date as of which the Accrued Benefit is computed ... .

As the Court of Appeals noted, there was no description whatsoever as to the mechanics of this so-called phantom account.  433 F.3d at 258.  For that reason, the Second Circuit and other courts rejected the administrator's utilization of such a mechanism in calculating benefits.

The SPD provides even less guidance than the Plan in this regard.  As the Court of Appeals noted, the only notice in the SPD concerning non-duplication of benefits was the proviso that "the amount you receive may also be reduced if you had previously left the company and received a distribution at that time." *Id.* at 265 (citing *Layaou*, 238 F.3d at 210).  The Court of Appeals in both *Frommert* and *Layaou* determined that this bare-bones notice failed to adequately apprise employees as to the phantom account mechanism.

In addition, as those and other cases make clear, where the Plan and the SPD conflict, the SPD controls. *See Burke,* 336 F.3d at 110; *Frommert,* 433 F.3d at 265. *Accord Tocker v. Philip*

*Morris Companies, Inc.*, 470 F.3d 481, 487-88 (2d Cir. 2006); *Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 210 n. 1 (2d Cir. 2006); *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55, 61 (2d Cir. 2006).

The question, then, is what, in light of these vague provisions in the Plan and SPD, this Court should to do to remedy the violation of ERISA.  I believe that the best course is to do what I did previously in *Layaou* involving a similar remand from the Court of Appeals.  *Layaou v. Xerox Corporation,* 330 F.Supp.2d 297 (W.D.N.Y. 2004).  In *Layaou*, I directed the administrator "to recalculate plaintiff's retirement benefit, ... and to pay plaintiff a lump sum in the amount of the difference between the amount of benefits that plaintiff has received, and the amount of the recalculated benefit, without any consideration of a 'phantom account.'"  *Id.* at 305 (footnote omitted).  I added that "[i]t would not be unreasonable ... for the administrator to subtract out the amount of the prior distribution," in order to avoid giving the plaintiff a windfall, but left it to the Plan administrator to perform the actual calculation of the plaintiff's benefits in the first instance, stating that "[i]f plaintiff believes that the administrator's calculation is erroneous, and the matter cannot be resolved between the parties, he can seek further relief in this Court."  *Id.* at 304.

The same process should apply here.  This process is straightforward; it adequately prevents employees from receiving a windfall, and I believe it most clearly reflects what a reasonable employee would have anticipated based on the not-very-clear language in the Plan and SPD.  Again, if there is some doubt or ambiguity as to this formula, it must be resolved in

favor of the employee.  *See Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 353 (2d Cir. 2003) (in reading an ERISA plan, "[w]e construe ambiguities against the drafter and in favor of the beneficiary"); *Perreca v. Gluck*, 295 F.3d 215, 223 (2d Cir. 2002) ("absent evidence indicating the intention of the parties, any ambiguity in the language used in an ERISA plan should be construed against the interests of the party that drafted the language").

In so ruling, I also reject defendants' suggestion that the phantom account offset can properly be applied to *all* employees' accrued benefits earned *after* 1998, regardless of when the employees were rehired.  As defendants themselves note, the Second Circuit's statement that "the phantom account may not be applied to employees rehired prior to the issuance of the 1998 SPD," 433 F.3d at 263, "does not expressly contain this limitation," Defendant's Pre-Hearing Brief Addressed to Remedies, Dkt. #121-1 at 23, and I decline defendants' invitation to infer such a limitation from that apparently categorical statement.  The Court of Appeals gave this Court specific directives on remand, and determining whether the phantom account offset should apply to post-1998 earned benefits of employees rehired prior to that date was not among those directives.

## II. Which of the Plaintiffs Were Rehired by Xerox after the Plan Was Amended in 1998

The Court of Appeals also directed the district court "to determine which of the plaintiffs were rehired by Xerox after the Plan was amended to include the phantom account and thus can be bound by its terms."  433 F.3d at 269.  This directive relates to the Second Circuit's holding

that "for employees rehired subsequent to the amendment of the Plan through the 1998 SPD, the

phantom account is a component of the Plan that they joined and thus may permissibly be applied

to them." *Id.* at 263. As the court explained,

> [e]mployees hired after this amendment to the Plan occurred, unlike those rehired before
> then, became Plan participants under the terms of the amended Plan. As such, the
> phantom account may permissibly be applied to them. With full notice of the phantom
> account's existence, these rehired employees, unlike their predecessors who lacked such
> information, had the opportunity to make an informed decision about taking or leaving
> the terms of the deal offered to them under the Plan.

*Id.* at 269. That matter does not appear to be in dispute, however, and I presume that the parties

will be able to agree on whether each employee was rehired prior to or after the 1998 amendment

date. If the parties are unable to agree about whether a particular employee was rehired prior to

that, they may seek a determination of that question from the Court.


**III. Effect of the Releases Signed by Twenty-Two Plaintiffs**

On January 5, 2001, plaintiffs' counsel filed a motion for "emergent injunctive relief,"

seeking relief in connection with Xerox's offer to plaintiffs to accept the termination of their

employment as part of a reduction in force ("RIF"), and to sign a general release waiving any

existing or potential claims they might have had against Xerox–including ERISA claims–in

exchange for salary continuance, a form of severance benefit in which the employee would

continue to receive his full, regular salary for a specified period even after he stopped working at

Xerox.

In his affidavit in support of that motion, plaintiffs' attorney, Robert H. Jaffe, Esq., characterized Xerox's offer as a form of discrimination against his clients based on their exercise of their rights under ERISA by filing or joining this lawsuit challenging defendants' use of the phantom account offset.  Dkt. #47 ¶ 2.

In his affidavit, Jaffe noted that the proposed release "includes a waiver or withdrawal of any claims that were made or could have been made by [plaintiffs] for recalculation of retirement benefits under ERISA."  *Id.* ¶ 5.  He added that "[t]he form of general release which Xerox has asked at least five clients of my law office to execute explicitly includes a release of all claims under ERISA."  *Id.* ¶ 8.

Jaffe stated that as of the date of the affidavit, five of his clients, three of whom were then named plaintiffs in this action, had asked him to review the proposed release "and suggest an alternative which would avoid a waiver of their rights under ERISA," at least until the Second Circuit issued a decision in *Layaou*, which was then pending before the Court of Appeals.[1]  *Id.* ¶ 9.  Jaffe stated that he had drafted a revised release containing language "which carves out from its scope the waiver of pending ERISA claims for recalculation of retirement benefits."  *Id.* ¶ 10. Jaffe said that his clients had presented the revised release to Xerox, but were told by Xerox that "it was unacceptable."  *Id.*

---

[1]The Second Circuit's decision remanding *Layaou* was issued about two weeks after plaintiffs filed their motion, on January 18, 2001.

After hearing oral argument, this Court denied plaintiffs' motion in open court on January 11, stating in effect that I saw no ERISA violation in an employer's conditioning an offer of severance benefits on a release of ERISA claims.  *See* Dkt. #53 at 38-42.

Twenty-two of the 104 named plaintiffs did subsequently sign the releases and were terminated in a RIF in exchange for salary continuance.  Dkt. #133-7.  Although the exact language used varies somewhat among the releases, in general they state that the employee "release[s] Xerox from any and all claims, even if [the employee] d[oes]n't know about the claim at this time, based on anything that has occurred prior to the date [the employee] sign[s] this Release."[2]  The releases expressly referenced a number of types of claims covered by the release, including ERISA claims.  With certain exceptions not relevant here, the releases also provided that the employee agreed not to "file or pursue any charge or claim with any governmental agency or any court against Xerox based on anything that occurred before [the employee] signed this Release."  *Id.*

Each release also states that the employee "acknowledge[s] and agree[s] that the consideration set forth in this Release is in addition to anything of value to which [the employee] is entitled by law and/or Xerox policy."  *Id.*  Four of the releases, however, contain additional language carving out an exception for plaintiffs' claims in this action:  "I acknowledge and agree that the consideration set forth in this Release is in addition to anything of value to which I am

---

[2]"Xerox" is defined by the releases to include, *inter alia*, "the Xerox employee benefit plans" in which the employee was a participant, as well as the trustees and administrators of those plans.  Dkt. #133-7.

entitled by law or Xerox policy, including my right to a pension under the Xerox Retirement

Income Guarantee Plan to which I do not release my claim as a member of the Frommert

lawsuit." *Id.* at 49, 57, 69, 88.

Plaintiffs now contend that the execution of these releases, even the ones without a

specific exclusion for the claims in this lawsuit, does not bar any of them from pursuing their

ERISA claims in this action.  Plaintiffs contend that the releases are ambiguous in certain

respects, and therefore unenforceable.

As a preliminary matter, I note that plan participants can waive ERISA claims, and that

such waivers will be enforced as long as they are knowing and voluntary.  *See*, *e.g.*, *Laniok v.*

*Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1367 (2d Cir. 1991)

("the age discrimination provision of ERISA does not prohibit an individual waiver of pension

plan participation by an older employee, ... so long as the waiver is knowing and voluntary");

*Mange v. Petrolite Corp.*, 960 F.Supp. 206, 209 (E.D.Mo. 1997) ("Under ERISA, a release of

claims by plan participants is valid so long as it is knowing and voluntary").  There is also

authority that "[a] settlement agreement that releases legal claims in exchange for severance

benefits may be enforced under ERISA."  *Seman v. FMC Corp. Ret. Plan*, 334 F.3d 728, 731-32

(8th Cir. 2003); *see also Smart v. Gillette Co. Long-Term Disability Plan*, 887 F.Supp. 383, 386

(D.Mass. 1995) (employee knowingly, intentionally, and voluntarily agreed to a severance plan

that included a general release which precluded her ERISA claim), *aff'd*, 70 F.3d 173, (1st Cir.

1995).

- 13 -

The Second Circuit has cautioned, however, that "[t]he validity of an individual's waiver of pension benefits is subject to closer scrutiny than his or her waiver of general contract claims." *Finz v. Schlesinger*, 957 F.2d 78, 81 (2d Cir. 1992), *cert. denied*, 506 U.S. 822 (1992); *accord Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 231 (2d Cir. 1995). Courts should look to the "totality of circumstances" to determine whether a release is knowing and voluntary. *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 231 (2d Cir. 1995).

The relevant factors to consider in this analysis include: (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the release before signing it; (3) the plaintiff's role in deciding the terms of the release; (4) the clarity of the release; (5) whether the plaintiff was represented by or consulted an attorney; (6) whether the consideration given in exchange for the employee's waiver exceeds benefits to which the employee was already entitled by contract or law; (7) whether the employer encouraged the employee to consult an attorney; and (8) whether the employee had a fair opportunity to do so. *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 402-03 (2d Cir.), *cert. denied*, 493 U.S. 924 (1989). These factors are not exhaustive, and all need not be satisfied before a release is deemed enforceable. *Id.*

Here, some of these factors, such as the time (45 days) that plaintiffs had to consider whether to sign the release, and Xerox's encouragement to them to consult an attorney before signing, weigh in favor of enforcement of the releases. Other factors, however, are more

troubling, particularly the clarity of the release and the consideration given by Xerox in exchange for the releases.

Paragraphs 3 and 4 of the releases generally provide that the employee releases Xerox from any and all employment-related claims.[3]  Paragraph 3 states that the employee "release[s] Xerox from "any and all claims ... based on anything that has occurred prior to the date" on which the employee signed the release, and paragraph 4 states that the employee "also release[s] Xerox from claims based on [any federal, state or local law] concerning employment ... ." Paragraph 3 lists ERISA claims as one of the types of claims waived by the employee.  Read literally, this could be construed to mean that the employee was waiving *any* claim under ERISA, based on anything that occurred prior to the date on which he signed the release.

As stated, paragraph 5 states that the consideration set forth in the release, *i.e.*, Xerox's agreement to provide the employee with salary continuance, is "in addition to anything of value to which [the employee] is entitled by law and/or Xerox policy."  This provision was presumably included in the release in order to conform to the requirements of the Older Workers Benefit Protection Act ("OWBPA"), which was enacted by Congress to modify the Age Discrimination in Employment Act ("ADEA") in certain respects, *see Meacham v. Knolls Atomic Power Laboratory*, 461 F.3d 134, 150 (2d Cir. 2006).

---

[3]These numbers refer to Xerox's standard release form for participation in a voluntary RIF.  *See, e.g.*, Dkt. #133-7 at 47.  The numbering varies somewhat among the releases signed by plaintiffs (some of whom were terminated in involuntary RIFs), though the provisions are essentially the same.

The OWBPA provides in part that "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary," and that in general "a waiver may not be considered knowing and voluntary unless at a minimum" certain conditions are met, one of which is that "the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled ... ."  29 U.S.C. § 626(f).

The import of paragraph 5 is that the salary continuance given to the employee did not take the place of, but was in addition to, any benefits to which the employee was *already* entitled by law or Xerox policy.  This suggests that the employee was *not* waiving his right to such benefits.  If he were, it would make little sense to describe his salary continuance as being "in addition to" such benefits.

Read that way, the releases would not bar plaintiffs' claims here.  If plaintiffs were entitled to pension benefits under the law, *i.e.*, ERISA, or under Xerox's own policies, they did not waive their rights to such benefits.  Furthermore, while it might be argued that there is a distinction between a right to pension benefits in general and a "claim" seeking to have those benefits calculated according to a particular formula, that is a distiction without a difference here, because the Second Circuit has now held that, at least with respect to employees rehired before 1998, Xerox's "reduction of justified expectations of benefits [by using the phantom account] took the form of a retroactive cut-back in violation of" ERISA.[4]  433 F.3d at 268.  In other words,

---

[4]ERISA's anti-cutback rule provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."  29 U.S.C. § 1054(g)(1).

those employees were "entitled by law" not simply to receive *some* pension benefits, but to have their benefits calculated without any reduction attributable to a "phantom" account.

Even if some other interpretations of the releases might be plausible, the releases are at the very least ambiguous as to what the employee was giving up in exchange for salary continuance. Section 5 may have been added primarily to comply with the OWBPA, but it cannot be ignored, and when read in conjunction with paragraphs 3 and 4, it appears to create some doubt about whether the release truly covered all ERISA claims, especially the proper calculation of benefits to which the employee was entitled.[5]

I recognize that these releases were signed during this litigation, and that in plaintiffs' January 5, 2001 motion for injunctive relief, plaintiffs' own counsel expressed his concern that the releases would constitute "a waiver or withdrawal of any claims that were made or could have been made by [plaintiffs] for recalculation of retirement benefits under ERISA." Certainly these facts could suggest that at least some of the parties understood the releases to cover their claims in this lawsuit. That does not alter the fact, though, that by its terms, the release appears to except from the scope of the waiver any benefits to which the employee is legally entitled.

---

[5]I recognize that there is authority that noncompliance with the OWBPA does not automatically invalidate a release as to non-ADEA claims. *See Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 375 (5th Cir. 2002); *Kaminski v. CoreStates Fin. Corp.*, No. CIV. A. 98-CV-1623, 1998 WL 800536, at *3 (E.D.Pa. Nov. 18, 1998). That does not make such noncompliance irrelevant, however. The requirements of the OWBPA were intended by Congress to ensure that an employee's waiver of his rights be "knowing and voluntary." 29 U.S.C. § 626(f)(1). Thus, an employer's tendering of consideration that does not exceed the value of anything to which the employee was already entitled is some evidence that the employee's waiver executed in exchange for that consideration was not knowing and voluntary.

Under Xerox's interpretation, the Plan administrator could refuse to pay an employee *any* pension and, by dint of the release, the employee could do nothing about it.  Again, any ambiguity on that score should be resolved against Xerox, which drafted the releases.  *Lifson*, 333 F.3d at 353; *see also Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) ("ambiguities in contracts should be construed against the drafter").

Furthermore, if it had been the parties' mutual understanding that the releases covered all of plaintiffs' claims in this litigation, it would have been a simple enough matter for Xerox to have included language to that effect in the releases.  *See*, *e.g.*, *Morais v. Central Bev. Corp. Union Employees' Supplemental Ret. Plan*, 167 F.3d 709, 711 (1st Cir. 1999) (enforcing settlement agreement and release that expressly stated that plaintiff had directed his union to withdraw his grievance and demand for arbitration over disputed benefits).  A single sentence would have clarified the matter.  That some of the *plaintiffs* added language to their releases making clear that the releases did not cover their claims in this action demonstrates how easy it would have been for Xerox to insert language in the other releases to include the employees' claims in this particular case, which was already in litigation.[6]

The omission of any mention of this lawsuit is, in one sense, not surprising, though it is still worth noting.  On their face, these releases (other than the ones to which some plaintiffs

_____

[6]One could argue, of course, that the language added by several plaintiffs excluding their claims in *Frommert* suggests that the other releases *did* cover those claims.  That some plaintiffs chose to insert language clarifying what they understood to be the scope of the release, however, sheds little light on the meaning of the other plaintiffs' releases, which remain, at best, ambiguous on that score.

inserted language expressly excepting their claims in this case from the scope of the release) do not appear to have anything to do with this litigation.  Rather, they appear to be standard release forms given to all employees who choose to participate in a RIF, and are aimed at foreclosing the possibility of the employee's later assertion of claims relating to his termination in the RIF.  In an effort to make them comprehensive, the release form lists an array of statutes, including ERISA, that it is intended to cover, but otherwise there is no suggestion that plaintiffs' claims in this case, or any other particular claims, were being waived.  On the contrary, the reference to the stated consideration being "in addition to anything of value to which [the employee is] entitled by law or Xerox policy" suggests that the employee did *not* waive any then-pending claims alleging an entitlement to some particular benefits.

Another factor that the Second Circuit has directed courts to consider in deciding whether a waiver is enforceable is whether the consideration given in exchange for the employee's waiver exceeds benefits to which the employee was already entitled by contract or law.  *Bormann*, 875 F.2d at 403.  In the case at bar, it appears that, at least with respect to some of the plaintiffs, the consideration received by the plaintiffs, *i.e.*, salary continuance, amounted to far less than they would have received under the Plan without the phantom account offset.  In the case of plaintiff Pietrowski, for example, it appears that his prior lump-sum payment at the time of his first separation, plus his severance pay at the time of his second separation, totaled about $210,000, but that he would have received over $832,000 as a lump-sum payment of his standard Plan annuity.  *See* Dkt. #130-2 Ex. D.

Defendants do not appear to dispute that the plaintiffs in question received less than they would have without the phantom account offset; they simply contend that the consideration received was substantial, and that in any event, the disparity is not as great as plaintiffs contend because defendants' proposed remedial approach would still result in a lesser benefit than what plaintiffs seek.  Of course, I have rejected that remedial approach.

The consideration received by plaintiffs here–in some cases up to a year's salary–was not insignificant.  In light of the Second Circuit decision, however, it cannot be said that these benefits exceeded what plaintiffs were entitled to by law, *i.e.*, pension benefits calculated without a phantom account offset.  While it is true that plaintiffs did not know, at the time that they signed the releases, what the ultimate result of this litigation would be, both they and Xerox knew that plaintiffs were pursuing ERISA claims for amounts far greater than what Xerox was offering them in exchange for signing the releases.[7]  This at least casts some additional doubt on whether the releases were entered into knowingly and voluntarily with respect to plaintiffs' ERISA claims.  *See Unum Life Ins. Co. of America v. Cappello*, 278 F.Supp.2d 228, 236 (D.R.I. 2003) (value of consideration that plan participant received, though "not an insubstantial sum," did not match what issuer of plan contended she waived by entering into severance agreement,

---

[7]It appears that one plaintiff, Matthew Alfieri, signed his release on October 27, 2006, after the Second Circuit decision was issued.  Dkt. #133-7 at 46.  I see no reason for this Court to rule any differently as to Alfieri, however.  If anything, the Second Circuit decision had by that point made it even clearer that Alfieri, like the other plaintiffs, was entitled to calculation of his pension benefit without the phantom account offset, and therefore that he was not waiving his claim in that regard.

since it was likely that amount of benefits to which she would have been entitled would have been substantial).

I also note that paragraph 3 only releases Xerox from claims "based on anything that ha[d] occurred prior to the date" on which the release was signed.  Arguably, that language did not cover plaintiffs' later receipt of benefits, in amounts less than that to which they claim they are entitled, due to the use of the phantom account offset.  At the time the releases were signed, plaintiffs had not yet left Xerox's employ, and had only received projections of what their benefits would be.  Again, that is not the only reasonably interpretation; one could also argue that in light of the existence of this lawsuit challenging that very offset, everyone involved understood the releases to cover any claims concerning the offset.  But this nonetheless adds to the ambiguity of the scope of the release, which should not be resolved against plaintiffs.


## IV. Breach of Fiduciary Duty

In its decision in this case, the Court of Appeals concluded that there was a triable issue of fact as to "whether the defendants had fiduciary obligations under ERISA and if so whether they breached them ... ."  433 F.3d at 271.  The court stated that

> [o]n remand, the district court should permit a trier of fact to assess (1) whether the defendants acted in a fiduciary capacity when they communicated with the Plan's beneficiaries about the implementation of the phantom account, and (2) whether those communications contained affirmative misrepresentations of fact concerning the Plan or breached the defendants' duty to deal fairly with the Plan's beneficiaries.

*Id.* at 271-72.  The court also "direct[ed] the district court that if the plaintiffs prevail on this claim, it must determine what 'appropriate equitable relief' is necessary."  *Id.* at 272.

- 21 -

Although it might appear difficult to reconcile this directive with the Court of Appeals'

holding that "[b]ecause adequate relief is available under [§ 502(a)(1)(B), which allows a plan

participant 'to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan'], there

is no need on the facts of this case to also allow equitable relief under § 502(a)(3)," 433 F.3d at

270, I find it unnecessary to resolve any apparent contradiction in that regard, since plaintiffs do

not appear to seek any equitable relief on remand, other than relief which either this Court has

effectively granted, or which the Second Circuit has already found to be unwarranted.

Plaintiffs do contend that the Court should rule that the Second Circuit's decision in this

case is "class-based," and that it "encompasses all rehired Xerox employee rehired prior to the

publication of the September 1998 SPD," Dkt. #129-1, but to the extent that plaintiffs seek some

sort of declaratory or injunctive relief in that regard, the Second Circuit has held that this is not a

proper case for such relief.  As stated, the Court of Appeals held that "the necessary remedies can

be fully provided under § 502(a)(1)(B)," 433 F.3d at 269, and concluded that "sweeping relief" in

the form of a judgment declaring that the phantom account is prohibited by ERISA and enjoining

its application in calculating the benefits of any Plan participants was "not warranted," *id.*[8]

Having said that, the rulings contained both in the Second Circuit decision and in this

Decision and Order *do* seem applicable to all Xerox employees who are similarly situated to the

---

[8]If plaintiffs' use of the term "class-based" is meant to imply that the Court should grant some "class"-wide relief, that request is also denied.  This is not a class action, nor have plaintiffs ever presented it as, or sought to make it a class action.

named plaintiffs.  Leaving aside any particularized defenses that the Plan might have against

individual employees, I do not see how defendants could continue to utilize the phantom account

as to such employees without running afoul of the Second Circuit's holding that "the phantom

account may not be applied to employees rehired prior to the issuance of the 1998 SPD."  433

F.3d at 263.  The clear import of the Second Circuit's decision is that utilization of the phantom

account with respect to employees rehired before the 1998 Plan amendment violates ERISA.  But

neither this Court, nor apparently the Second Circuit, sees any basis for granting equitable relief

in that regard at this time.

I also note that the purported basis for plaintiffs' claim for breach of fiduciary duty

appears to have shifted somewhat over the course of this litigation.  Originally, plaintiffs alleged

that "defendants breached their fiduciary duty to Plan participants by publishing and supplying

misleading information in SPDs, annual Personal Benefits Statements and in response to the

plaintiffs' requests for clarification of their rights under the Plan."  433 F.3d at 270.  On remand,

however, this claim seems to focus largely if not entirely on the releases signed by some of the

plaintiffs.  Specifically, plaintiffs now contend that defendants breached their fiduciary obligation

to disclose to those Plan participants who signed the release "that implementation of the phantom

account offset violates ERISA § 204(g) and ERISA § 204(h) and further that the consideration

paid for executing the release was substantially less than the retirement benefits to which they

may be entitled to receive [sic] if the phantom account offset was  not applied."  Dkt. #129-1 at

15.

In any event, the relief that plaintiffs now seek is simply a ruling by this Court that the releases are unenforceable against plaintiffs insofar as it purports to waive claims for "enhanced" retirement benefits, *i.e.*, benefits calculated without using the phantom account offset. *See id.* at 19. That is essentially what the Court has done. Plaintiffs are getting all of the relief, equitable or otherwise, to which they are entitled. There is no need, therefore, to rule on plaintiffs' claim for breach of fidudiary duty.

## V. Plaintiff Holland

Plaintiff Lawrence R. Holland has at all relevant times been an hourly (*i.e.*, non-salaried) Xerox employee who is covered by the terms of a collective bargaining agreement. Defendants contend that as such, Holland has never been a participant in the Plan, which by its terms excludes from its coverage "[a]ny person covered by a collective bargaining agreement, the terms of which do not require coverage under this Plan ... ." Dkt. #121-5 at 6. Therefore, defendants contend, Holland lacks standing to sue for benefits under the Plan.

In response, plaintiffs do not appear to deny that Holland is a participant in a different pension plan from the one at issue in this case, but contend that the plan in which he is a participant utilizes the same phantom account offset as the Plan covering the other plaintiffs. The essence of plaintiffs' argument seems to be that the Court should simply allow Holland's claims to go forward in this case so that hourly Xerox workers will be able to benefit from the

Second Circuit's rulings in this case and the relief ordered by this Court with respect to the other named plaintiffs.

Holland's request must be denied.  It is axiomatic that only plan participants and beneficiaries may sue for benefits under § 1132(a)(1)(B).  *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100-01 (2d Cir. 2005) (citing *Franchise Tax Board v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983)).  Holland's suggestion that the Court allow the administrators of his plan to be joined as defendants in this action is denied, as plaintiff has shown no basis for adding additional defendants in this case at this late date.  Plaintiffs' contention that defendants have only recently raised the argument that Holland is not entitled to any benefits under the Plan is contradicted by this Court's July 30, 2004 Decision and Order, in which I expressly referenced (but found it unnecessary to decide) defendants' arguments to that effect, 328 F.Supp.2d at 439 n. 14.  Furthermore, plaintiffs have made no motion to amend the complaint to add additional defendants, and plaintiffs' memoranda and other papers on remand are not a proper vehicle for making such a request.[9]

**VI. Plaintiffs' Motion to Amend the Complaint**

On November 6, 2006, plaintiffs filed a motion for leave to file a second amended and consolidated complaint, adding a number of additional plaintiffs in this case.  The gist of the

---

[9]It would seem to be beyond dispute, though, that use of a "phantom account" in the manner found unlawful by the Second Circuit decision violates ERISA and cannot be used by *any* plan.  It is presumed that no plan administrator would knowingly violate ERISA.

motion was that following the remand from the Second Circuit, additional Xerox employees who had been separated from and then rehired by Xerox prior to 1998 contacted plaintiffs' counsel, seeking to join in or obtain the benefits of this lawsuit.  Plaintiffs' counsel wrote to the Plan administrator, essentially asking him to waive these individuals' exhaustion requirements under ERISA and apply the rulings of this Court and the Court of Appeals in this case and in *Layaou* to these additional Plan participants.  Dkt. #132-3 at 1-4.  The administrator's response was, essentially, that until a "final resolution" of this action, the phantom account offset would continue to be applied to all Plan participants, with "no exception or deviation."  *Id.* at 5.

To the extent that any of the proposed new plaintiffs have not yet retired from Xerox, I see no basis for adding them to this lawsuit.  As stated earlier, the Second Circuit's holding that "the phantom account may not be applied to employees rehired prior to the issuance of the 1998 SPD," 433 F.3d at 263, would certainly seem to foreclose defendants from utilizing the phantom account in calculating "new" retirees' pension benefits.

At this point, however, this motion has not been briefed by defendants, and since there may be issues involving individualized defenses or other matters bearing upon the motion to amend, I will not decide the motion at this time, but will instead reserve decision after the matter has been fully briefed, as set forth in the Conclusion of this Decision and Order.

## CONCLUSION

Plaintiffs' motion for a determination of the decision of the Second Circuit Court of Appeals and for other further relief (Dkt. #129) is granted in part and denied in part, and

defendants' cross-motion for partial summary judgment (Dkt. #133) is granted in part and denied in part.  Defendants are hereby directed to recalculate plaintiffs' retirement benefits, consistent with the terms of this Decision and Order and the January 6, 2006 decision of the Court of Appeals for the Second Circuit, and to pay each plaintiff a lump sum in the amount of the difference between the amount of benefits that each plaintiff has received, and the amount of the recalculated benefit, without any consideration of a "phantom account."  Plaintiffs' claim for breach of fiduciary duty is denied as moot.  Plaintiff Lawrence Holland's claims are dismissed in their entirety.

Defendants are directed to respond to plaintiffs' motion for an extension of time to file a second consolidated and amended complaint (Dkt. # 132) within thirty (30) days after the date of issuance of this Decision and Order.  Plaintiffs shall file reply papers no later than fifteen (15) days after the date that defendants' response is filed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       January 24, 2007.