UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PAUL J. FROMMERT, et al.,


                              Plaintiffs,

                                                    DECISION AND ORDER

                                                    00-CR-63llL

               v.

LAWRENCE BECKER,
Xerox Corporation Plan Administrators,
XEROX CORPORATION RETIREMENT
INCOME GUARANTEE PLAN,


                              Defendants.

_____


        In 2000, several employees of  Xerox Corporation ("Xerox") filed a lawsuit seeking

additional pension benefits.  Over fifteen years later, this case continues, having seen decisions by

this Court, the Court of Appeals for the Second Circuit, and the United States Supreme Court.  This

Court must now address issues presented by a remand from the Court of Appeals, and by several

motions filed by plaintiffs.

        This action was begun in the District of Connecticut, and was transferred to this Court in July

2000.  The case presents claims under the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1101 *et seq.*

In general, this case, and several related cases, involve Xerox employees who were participants in the Xerox Retirement Income Guarantee Plan ("Plan").  Plaintiffs left Xerox's employ at some point, at which time they each received a lump-sum distribution of accrued pension benefits. Plaintiffs later returned to work for Xerox, for a second period of employment.  The basic dispute arises out of Xerox's treatment of the prior distributions when calculating plaintiffs' subsequent pension benefits, following their second period of employment.

The history of this litigation and the relevant issues presented here have been laid out at length in prior decisions of this Court and of the appellate courts.  The reader's familiarity with those decisions and with the background of this case is assumed.  The following summary will suffice for purposes of this Decision and Order.[1]

The central issue in this case involves how to take plaintiffs' past distributions from Xerox into account when calculating plaintiffs' current or future retirement benefits.  What initially gave rise to this litigation was defendants' use of a so-called "phantom account," which involves reducing participants' benefits based on a hypothetical appreciation of the prior lump-sum distribution.  The details of the phantom account have been set forth in several reported decisions, including *Frommert v. Conkright*, 433 F.3d 254, 257-61 (2d Cir. 2006).

Several cases have been brought in this Court arising out of this general core of operative facts; some of those cases have been resolved, while others remain pending.  The present Decision and Order addresses just one case, *Frommert v. Conkright*, which might fairly be described as the

---

[1]For a detailed recitation of the history of this litigation, *see Frommert v. Conkright*, 738 F.3d 522, 525-29 (2d Cir. 2013), and the cases cited therein.

"lead case," although some of the issues presented here may be common or relevant to some of the other cases.

Some issues have been decided in this case.  For one thing, it is now clear that defendants' application of the phantom account violated plaintiffs' rights under ERISA, and that plaintiffs are entitled to relief for that violation.[2]  The primary question now before the Court is what form that remedy should take.

In 2010, the United States Supreme Court issued a decision in this case holding, in short, that this Court could not refuse to defer to the plan administrator's interpretation of the Plan simply because the Court of Appeals had found one previous related interpretation by the administrator to be invalid.  *See* 559 U.S. 506, 522.

Upon remand, this Court applied so-called *Firestone* deference to the administrator's interpretation, under which "[a] court may overturn a plan administrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotation marks omitted).  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  The Court did defer to the plan administrator's interpretation, and applied an "offset" method of calculating plaintiffs' benefits, the details of which need not be recited here.  825 F.Supp.2d 433, 438-40 (W.D.N.Y. 2011).

---

[2]Xerox's use of the phantom account has also been rejected by the Ninth Circuit.  *See Miller v. Xerox Corp. Ret. Income Guarantee Plan*, 464 F.3d 871 (9th Cir. 2006).  *See also Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003) (finding that Xerox's method of calculating certain lump-sum distributions violated ERISA's requirement of "actuarial equivalency").

On appeal from that decision, the Court of Appeals vacated and remanded, and that is the posture in which the case is now before this Court.  *See* 738 F.3d 522 (2d Cir. 2013).  In its decision ("remand decision"), the Court of Appeals "f[ou]nd that the [plan administrator's] proposed offset produces an absurd and contradictory result and is therefore unreasonable."  738 F.3d 522, 531 (2d Cir. 2013).  The court stated that this approach could "make[] the rehired employees worse off under the Plan in terms of actual benefits received," as compared to newly-hired employees.  *Id.* at 530. The court also found no language in the Plan that would support such a result.  *Id.* at 531.

The Second Circuit went on to "consider, assuming *arguendo* that the Plan Administrator's offset method was a reasonable interpretation of the Xerox Plan, whether the offset violated ERISA's notice requirements and therefore cannot be applied to the Plaintiffs' benefits."  The court held that regardless of the standard of review applied, "the Plan [as interpreted by the administrator] violates ERISA's notice provisions."  *Id.* at 531.  Specifically, the court held that "the SPDs fail to clearly identify the circumstances that will result in an offset, are insufficiently accurate and comprehensive, and fail to explain the 'full import' of Section 9.6 of the Plan," which provides that "the accrued benefit of [a beneficiary] based on all Years of Participation shall be offset by the accrued benefit attributable to [any past] distribution."  *Id.* at 532.

Significantly, the court concluded that "in the circumstances of this case *any* offset of the RIGP [Retirement Income Guarantee Plan, *i.e.*, the basic benefit plan] benefit violated ERISA's notice provisions ... ."  *Id.* at 534 (emphasis in original).  In support of that holding, the Court of Appeals said that "[f]irst and foremost, the SPDs do not state that the amount of the lump-sum distribution *will* reduce the RIGP benefit, stating only that it 'may' result in a reduction."  Describing

this as "a critical omission," the court said that it did "not see how a beneficiary would know, given the SPDs' use of the word 'may,' that a prior distribution from an account would reduce his benefit under a formula unless the SPD made clear the interaction between the two.  Thus, any interpretation of the Plan that necessarily reduces the RIGP benefit would violate ERISA's notice requirements." *Id.* at 532.

"Second and relatedly," the court added,

even assuming that the SPDs prescribe an offset to RIGP, the SPDs fail to describe the mechanics of any offset.  Specifically, the SPDs fail to state the interest rate to be used to make the actuarial equivalence [of the annuity value of the prior lump-sum distribution].  A higher interest rate would lead to a much larger offset than a lower one, leading to a correspondingly greater reduction of benefits. The SPDs are therefore insufficiently accurate and comprehensive.

*Id.*  The court rejected all of defendants' arguments concerning the notice issue, and held that "there was not adequate notice in this case."  *Id.* at 534.

With respect to the appropriate remedy, the court stated that on remand, "the district court should first consider equitable remedies.  In order to impose an equitable remedy, the district court must consider two questions:  (1) what remedy is appropriate; (2) whether Plaintiffs have established the requisite level of harm as a result of the notice violations."  *Id.*

The court went on to state that

[i]f the district court holds that the Plan's notice violations justify the imposition of an equitable remedy, such a remedy will provide the relief that Plaintiffs seek.  However, if it finds that no equitable remedy is available, it should separately consider Plaintiffs' unreasonable-interpretation claim, under which the appropriate remedy is to enforce the terms of the Xerox Plan.

*Id.*  Having set forth those parameters, the court remanded the case to this Court for further proceedings.

That remand decision forms the primary relevant framework within which this Court must now work to determine the proper remedy.  A full understanding of that decision requires that it be viewed in the context of the history of the litigation in this case, but as stated, the reader's familiarity with that background is assumed.  Other relevant decisions will be referenced as necessary below.

In the wake of the Second Circuit's remand, this Court, by letter dated October 2, 2014, directed defendants to submit their current proposed interpretation of the Plan to the Court.  I also directed plaintiffs to submit a "concrete proposal as to what equitable remedy is warranted for the notice violation."[3]

Defendants submitted a response, setting forth a proposed methodology for calculating plaintiffs' benefits.  Dkt. #266.  Plaintiffs responded to this Court's October 2 directive by moving for summary judgment, seeking a judgment that they are entitled to one of several alternative forms of equitable relief.  Dkt. #267.  Plaintiffs have since filed an additional summary judgment motion based on defendants' alleged bad faith.  Dkt. #278.  Defendants have responded to those motions, and the Court has heard oral argument on all the matters now pending before me (Dkt. #280).

---

[3]Prior to the Court's issuance of that directive, plaintiffs also filed, in response to the Second Circuit's decision, what they styled as a "motion for [an] order compelling payment of amounts indisputably due."  (Dkt. #254.)

**DISCUSSION**

**I. Remedy on Remand**

While plaintiffs have moved for summary judgment, the primary task before the Court is to deal with the Second Circuit's directives in its remand decision. The Court of Appeals instructed this Court to determine an appropriate remedy for defendants' ERISA violations. The court made no findings as to which remedy would be best, but it did state that this Court should first address whether an equitable remedy is appropriate. The court also set forth some general parameters in that regard.

As stated, the Court of Appeals based its decision on two grounds. First, the court found that the plan administrator's proposed offset approach was based on an unreasonable interpretation of the Xerox Plan. Second, the court concluded that the Plan and its related SPDs violated ERISA's notice provisions, in light of defendants' interpretation and application of the Plan. 738 F.3d at 534. Significantly, the Court of Appeals found that "in the circumstances of this case *any* offset of the RIGP benefit violated ERISA's notice provisions ... ." *Id.*

As the Second Circuit's decision illustrates, then, the fundamental problem in this case is twofold, yet with a single source: the inadequacy of the Plan documents. As a matter of plan interpretation, those documents do not support the application of the offsets that have been utilized in the past, and proposed now, by defendants. Second, defendants failed to adequately notify Plan participants of the existence or operation of those offsets. *See id.* at 531 ("No provision in the Xerox Plan defines the offset in accordance with the method the Plan Administrator advocates").

Though the Court of Appeals discussed plan interpretation before turning to the notice issue, it was not mere happenstance that the court directed this Court, on remand, first to consider whether to impose an equitable remedy. As the Second Circuit stated, if this Court finds an equitable remedy to be appropriate, there will be no need to move on to questions of plan interpretation, since "such [an equitable] remedy will provide the relief that Plaintiffs seek," *Id.* at 534. Only "if [this Court] finds that no equitable remedy is available [should this Court] separately consider Plaintiffs' unreasonable interpretation claim, under which the appropriate remedy is to enforce the terms of the Xerox Plan." *Id.*

What is equally apparent from the remand decision is that the appropriateness of equitable relief is inextricably tied to the notice issue. That explains the court's statement, "Because we hold that in the circumstances of this case *any* offset of the RIGP benefit violated ERISA's notice provisions, the district court should first consider equitable remedies." *Id. See also id.* (stating that if this Court finds *no* equitable remedy to be appropriate, the Court "should enforce a reasonable interpretation of the Plan, without again considering the issue of notice").

In accordance with the Court of Appeals' decision, then, this Court must first consider whether defendants' notice violations justify the imposition of an equitable remedy. I find that they do justify such a remedy, and that the appropriate equitable remedy is to recalculate plaintiffs' benefits, treating plaintiffs upon their re-employment with Xerox as if they had been newly hired,

with no offset whatsoever.  There is, then, no need for this Court to analyze and consider Xerox's latest[4] interpretation of the Plan.

Notably, the Second Circuit did *not* leave it to this Court to decide whether there had been a notice violation in the first place.  On the contrary, the court could not have made it any clearer that such a violation did occur.  The court stated:  "the Plan violates ERISA's notice provisions"; "The SPDs are ... insufficiently accurate and comprehensive"; "we find there was not adequate notice in this case"; and "the Plan and its related SPDs violate ERISA's notice provisions."  *Id.* at 531-34.

And while the court committed the nature and form of the remedy to this Court to decide in the first instance, the Court of Appeals stated that "in the circumstances of this case *any* offset of the RIGP benefit violated ERISA's notice provisions," *id.* at 534, and that "*any* interpretation of the Plan that necessarily reduces the RIGP benefit would violate ERISA's notice requirements," *id.* at 532 (both emphases in original).  At the very least, then, an appropriate remedy should neither offset nor otherwise reduce the benefits that plaintiffs would receive under the RIGP.

In its decision, the Second Circuit was plainly troubled by the possibility that a rehired employee could end up worse off than a newly-hired employee under otherwise identical circumstances.  To illustrate its point, the court set forth a comparison between two hypothetical Xerox employees, one of whom worked for Xerox for a period of years, left and came back, and a second employee who was hired at the same time as the first employee's rehire.  In other words, the court compared an employee in a situation similar to plaintiffs', with a straight "new hire."

_____

[4]Xerox's interpretation of the Plan's provisions have varied multiple times over the past several years, generally in response to court decisions.

As explained by the Second Circuit, using the plan administrator's then-approach, the first employee would end up worse off than the second employee, because he would either bear more market risk, or receive a smaller pension than the second employee. *Id.* at 530-31. The court stated that the Plan language did not support such a result, that "the offset should not place the [first] employee in a less than equivalent position" compared to the second employee, and that defendants' "proposed offset produces an absurd and contradictory result and is therefore unreasonable." *Id.* at 531.

The court went on to hold that regardless of whether the plan administrator's offset method was based on a reasonable interpretation of the Plan, this Court should first address defendants' notice violation, *i.e.*, the failure of the Plan to describe the mechanics of the offset. *Id.* at 532. The Second Circuit did not expressly endorse any particular remedy, but left that matter for this Court to decide.   It is clear, however, that the Court of Appeals was particularly concerned by the possibility that some rehired employees could end up with lower benefits than similarly situated new hires.

A "new hire" remedy addresses, and is tailored to, that problem.   Under this approach, plaintiffs will receive whatever benefits they are due for their second period of employment, the same as if they were new hires.  Their prior benefits will neither diminish their later benefits, nor will their prior period of service be used to grant them a windfall.   In short, they will be fully compensated for all their years of service.

It bears repeating that in support of its holding that the Plan, as interpreted and applied by defendants, violates ERISA's notice provisions, the Court of Appeals said that "[f]irst and foremost,

the SPDs do not state that the amount of the lump-sum distribution *will* reduce the RIGP benefit, stating only that it 'may' result in a reduction." The court termed this a "critical omission" because it did not inform beneficiaries that a prior distribution would reduce their benefits. 738 F.3d at 532.

Applying the new-hire remedy means, in effect, that there is no offset; for that matter, there is nothing to be offset in the first place. The prior lump-sum distribution has no effect whatsoever on the employee's subsequent benefits, and it is thus an apt remedy for the notice violation here.

In arriving at this remedy, the Court remains mindful of the Second Circuit's directive that this Court need not, and should not reach the issue of plan interpretation unless it finds that no equitable remedy is appropriate. *Id.* at 534. With regard to the latter, "it is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries." *Chao v. Merino*, 452 F.3d 174, 185 (2d Cir. 2006) (quoting *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984)). For the reasons stated, I find a new-hire remedy to be equitable and appropriate under the facts of this case.

## II. Harm

As the Second Circuit explained, however, before this Court can impose an equitable remedy, the Court must find the requisite level of harm. In its 2013 decision in this case, the Court of Appeals stated that "for claims of ERISA notice violations, plaintiffs need to satisfy a standard of 'likely prejudice.'" 738 F.3d at 534 (quoting *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 113 (2d Cir. 2003)). The court further explained that this standard does not necessarily entail a showing

of "detrimental reliance." *Id.* Rather, the court stated, "the district court must consider this question [of 'likely prejudice'] in tandem with the equitable remedies it may impose." *Id.*

In support of that statement, the Second Circuit cited the Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011)). Because of *Amara*'s relevance to the issues before this Court, some familiarity with that case is necessary.

In *Amara*, the Supreme Court granted certiorari "to consider whether a showing of 'likely harm' is sufficient to entitle plan participants to recover benefits based on faulty disclosures." *Id.* at 435. The Court stated that under the traditional law of equity, which informs the analysis of what equitable remedies are available under ERISA § 502(a)(3), "there is no general principle that 'detrimental reliance' must be proved before a remedy is decreed." *Id.* at 444.

The *Amara* Court went on to explain that while some traditional equitable remedies, such as estoppel, require a showing of detrimental reliance, other equitable remedies do not. Specifically, the Court identified the traditional remedies of reformation, which has been used to remedy fraud or mistake, and surcharge, which can be used to remedy a loss caused by a trustee's breach of duty. *Id.* at 440-44.

Reformation, the Court explained, is available to "reflect the mutual understanding of the parties" in cases involving fraud or mistake, even if the plaintiff was negligent in not realizing its mistake. *Id.* at 443. Similarly, the Court stated, the remedy of surcharge requires proof only of "actual harm." Such harm "may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents." *Id.* at 444.

The Supreme Court in *Amara* concluded that "[w]hether or not the general principles we have discussed above are properly applicable in this case is for [the district court] or the Court of Appeals to determine in the first instance." *Id.* at 445. On remand from the Supreme Court, the Second Circuit remanded to the district court, which found both reformation and surcharge to be appropriate remedies. 925 F.Supp.2d 242, 251 (D.Conn. 2012).

On appeal, the Second Circuit held that "the district court did not abuse its discretion in determining that the elements of reformation have been satisfied and that the plan should be reformed to adhere to representations made by the plan administrator." 775 F.3d 510, 514 (2d Cir. 2014). The court did not address any other equitable remedies, such as surcharge or estoppel. *Id.* at 532.

Based on my review of the record, I find that contract reformation is an appropriate equitable remedy in this case.[5] Under principles of long standing, "[a] contract may be reformed due to the mutual mistake of both parties, or where one party is mistaken and the other commits fraud or engages in inequitable conduct." *Id.* at 525 (citing *Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892)).

Before addressing the merits of this theory of relief, I note that defendants contend that it is too late for plaintiffs to seek contract reformation. Defendants assert that this is an "entirely new" remedial theory that was not sought in the complaint. Defendants contend that plaintiffs have only

---

[5]The Second Circuit in *Amara* agreed with the district court that "because the CIGNA Pension Plan is part of a compensation package for employees that stems from their employment agreements, plaintiffs have given consideration for their participation in the retirement plan so that it is appropriate, to the extent this plan constitutes a trust, to analyze reformation under contract principles," rather than under trust principles. 775 F.3d at 525.

recently advanced this avenue of relief, as an afterthought in the wake of the Supreme Court's and Second Circuit's decisions in this case and in *Amara*.  *See* Def. Mem. (Dkt. #271) at 12-14.

I am not persuaded by these arguments.  For one thing, in fashioning a remedy, this Court is not bound by the specific language of the complaint, particularly where the Court of Appeals itself explicitly directed this Court to consider equitable remedies. This Court must find an appropriate equitable remedy for what the Second Circuit determined to be Xerox's violation of the applicable notice requirements.  The Court's remedy is not cabined by the pleadings or requests of the parties.

This is not a situation in which plaintiffs, late in the day, have come forward with some entirely new theory of liability or relief, in a last-ditch attempt to save their claims from dismissal. It was the Second Circuit that instructed this Court to "first consider equitable remedies," and in doing so, the court cited *Amara*, which discussed contract reformation, among other remedies.

In any event, plaintiffs have sought equitable relief throughout this litigation, and whether they initially used the term "reformation" is not dispositive as to what relief is now available or appropriate, particularly in light of the Second Circuit's remand decision.  Over the course of this litigation, both sides have responded to appellate court decisions and changes in the legal landscape. Moreover, defendants cannot credibly claim prejudice at this point, after years of litigation and extensive discovery, merely because of the particular equitable theory of relief that plaintiffs are now advancing.

As stated, the remedy of reformation generally requires mistake on one side and fraud or other inequitable conduct on the other.  In *Amara*, the district court found, after a bench trial, that

the defendant had engaged in fraud.  This Court has not conducted a trial, and I make no finding of actual fraud on defendants' part.

But a finding of fraudulent intent is not required for the court to impose the remedy of reformation.  Courts have long recognized the concept of "equitable fraud," which involves the obtaining or retention of a benefit as a result of a breach of fiduciary or equitable duty, even in the absence of an actual intent to defraud.  "The law is clear that equitable fraud does not require a showing of intent to deceive or defraud." *Osberg v. Foot Locker, Inc.*, No. 07 Civ. 1358, 2015 U.S. Dist. LEXIS 132054, at *101 (S.D.N.Y. Oct. 5, 2015) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193-94 (1963)).  The general principle behind this concept is that it would be "inequitable and unconscientious for a party to insist on holding the benefit of a contract which he has obtained through misrepresentations, however innocently made."   *Hammond v. Pennock*, 61 N.Y. 145, 152 (1874) (cited in *Osberg*, 2015 U.S. Dist. LEXIS 132054, at *101).

Furthermore, as the Second Circuit explained in *Amara*, a defendant's "inequitable conduct" is enough to support reformation, when combined with the plaintiff's mistake.  "Inequitable conduct includes deception or even mere awareness of the other party's mistake combined with superior knowledge of the subject of that mistake." *DS Parent, Inc. v. Teich*, No. 5:13-CV-1489, 2014 WL 546358, at *4 (N.D.N.Y. Feb. 10, 2014) (citations omitted).

Given the extensive recitation of the facts of this case in prior decisions of this and the appellate courts, the Court need not go through the underlying facts of this case in detail to make the point that Xerox revealed the existence and operation of the phantom account offset only gradually, over a period of years.  As the Second Circuit has noted, there is no reason that Xerox could not

- 15 -

sooner have issued an SPD that adequately described the phantom account offset, or otherwise made clear to plan participants what to expect if they returned for a second stint at Xerox.  *See Frommert*, 738 F.3d at 533 ("Xerox could have issued an SPD [before 1998] describing the proposed offset without rendering it unreadable").  *See also Frommert*, 433 F.3d at 265-68 (explaining how the phantom account was not fully disclosed until 1998); *Frommert*, 328 F.Supp.2d at 424-27) (detailing history of plan disclosures).

Likewise, there can be no dispute that as Xerox slowly allowed information about the mechanics of the phantom account to emerge, plaintiffs began to make inquiries about the benefits they could expect to receive upon their final retirement.  Xerox, in other words, should have realized that a good many employees in plaintiffs' position–*i.e.*, who had left and come back–were confused and generally chagrined about what benefits they would receive in the future.  It was plaintiffs' eventual realization that their actual benefits would fall drastically short of what they had expected to receive that led to this litigation in the first place.

In particular, the evidence shows that at some point before 1998 (when the SPD finally spelled out the details of the phantom account), some plaintiffs began to get an inkling that their benefits might prove to be considerably lower than they had believed.  When they made inquiries, however, Xerox denied their claims for additional benefits. Plaintiff Frommert, for example, asked in 1996 why his benefits upon retirement would only be $5.31 per month, instead of the $2482 that he had been expecting.  *See* 328 F.Supp.2d at 428.  Xerox treated his inquiry as a request for additional benefits, which it denied, based on its interpretation of the Plan.  *Id.  See also Layaou v. Xerox Corp.*, 238 F.3d 205, 208 (2d Cir. 2001) (explaining how the Xerox employee in that case in

1995 had unsuccessfully challenged his claim for additional benefits in connection with the phantom account).

Those initial denials would prove to be harbingers of Xerox's dogged defense against plaintiffs' claims for additional benefits.  Like any defendant, Xerox is of course entitled to mount a defense to the claims against it, within certain boundaries.  But it is fair to say that while Xerox has yielded some legal ground over the years–generally only when compelled to do so by court decisions–it has done so grudgingly, block by metaphorical block.  While its actions may not have been "wrongful," then, that is not the test for determining whether Xerox's actions have been inequitable, for purposes of reformation.  Xerox's longstanding insistence that the application of the phantom account was justified, even though some plaintiffs had not been given sufficient notice of the existence or operation of that formula, can fairly be deemed "inequitable" as to the affected plaintiffs.

Again, proof of fraudulent intent is not required.  Xerox's failure to disclose the operation of the phantom account, combined with its intransigence in defending the use of the phantom account, produced an inequitable result.  That result, from plaintiffs' standpoint, was virtually indistinguishable from what would have occurred had defendants been motivated by fraudulent intent.  It is just such harm that the concept of equitable fraud was designed to remedy.  *See Capital Gains Research Bureau, Inc.*, 375 U.S. at 194 ("Fraud ... in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another") (citation and internal quotes omitted).

- 17 -

In considering the appropriate remedy, the Court is also mindful that the purpose of equity is "to secure complete justice." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (quotation marks and citation omitted). In striving to achieve that result, the Court is likewise cognizant of the longstanding principle that equity is marked by "a practical flexibility in shaping its remedies." *Brown v. Board of Education*, 349 U.S. 294, 300 (1955). *See also Brown v. Plata*, 563 U.S. 493, __, 131 S.Ct. 1910, 1944 (2011) ("Once invoked, the scope of a district court's equitable powers is broad, for breadth and flexibility are inherent in equitable remedies") (internal quotes and alterations omitted).

A new-hire remedy not only addresses the Second Circuit's specific concern that rehired employees should not be treated worse than new hires, it also leads to an equitable result in a broader sense. As stated, it means that rehired employees will neither be penalized for, nor receive a windfall from, their prior period of employment. Under this approach, a rehired employee will have been compensated for his or her entire period of employment: first, by the lump sum paid at the time of the employee's initial separation from Xerox, and second, by a separate benefit for the subsequent period of employment, calculated in the same manner as if the employee had been newly hired.

Both sides have at times expressed some amenability to a new-hire remedy. At oral argument in 2014, defense counsel stated that if plaintiffs' attorney "wants [the Court] to order the new hire approach as the remedy, ... we're in agreement." Dkt. #280 at 15. Plaintiffs' counsel also stated at that same argument that "we do ... request the Court [to] enter partial summary judgment that entitles the plaintiffs to be paid, as we believe the law now clearly requires, at least as well as new hires." *Id.* at 4.

Prior to that argument, in 2010, plaintiffs also requested the Court to direct the plan administrator to recalculate plaintiffs' pension in accordance with a "new hire" approach.  *See* Plaintiffs' Motion to Reenter Judgment (Dkt. #205) at 22.  *See also* Complaint (Dkt. #85) ¶ 111 (requesting an order directing defendants to provide plaintiffs with "retirement benefits at least equal to new hires ... .").

As with most aspects of this case, the parties may not see eye to eye about what a "new hire" approach means in practice.  Defendants have proposed a formula that they contend will ensure that "no Plaintiff is worse off under the Plan in terms of actual benefits received than if he or she had been a newly-hired employee with no prior service or prior distribution as of the Plainitff's date of rehire."  Dkt. #266-1 at 2, ¶ 5.  That approach involves a series of steps, calculations and adjustments, that defendants say would leave plaintiffs no worse off than new hires.

Plaintiffs also now state that they are *not* in fact requesting the imposition of a new-hire remedy.  They contend that while at a bare minimum, they should not be treated any worse than new hires, they should get more than that.

Plaintiffs further argue that defendants' proposed new-hire remedy is inappropriate because "it punishes plaintiffs by disregarding years of work and rewards Xerox by allowing it to have recaptured veteran talent at rookie prices."  Dkt. #267-1 at 25.  Plaintiffs contend that their benefits should be calculated using either the so-called "*Layaou*" offset, under which their current benefits would be offset only by the nominal amount of each plaintiff's prior distribution, or an "actual annuity" offset, under which their benefits would be offset by an amount equal to the annuity that

the employee was entitled to upon his or her initial departure from Xerox.[6]  *See* Dkt. #267-1 at 26;

Dkt. #231 at 7-9.  As a third alternative, plaintiffs contend that the Court should impose a "no offset"

remedy, as explained below.  Dkt. #267-1 at 15.

Plaintiffs also assert that despite defendants' apparent recognition that plaintiffs are entitled

to at least a new-hire remedy, defendants have demonstrated their bad faith by continuing to deny

plaintiffs such relief.  *See* Dkt. 278-1 at 4.  Plaintiffs contend that due to defendants' bad faith, the

Court should accord no deference to the plan administrator's current interpretation of the Plan.

To the extent that these arguments relate to the issue of plan interpretation, I do not address

them, because I am not interpreting the Plan.  As stated, the Second Circuit directed this Court first

to consider equitable remedies for defendants' violation of ERISA's notice requirements.  Such

remedies do not depend on plan interpretation.   And I find that an equitable remedy, based on a

"new hire" approach, is appropriate.

But I do not intend to use the approach advanced by defendants.  The plan administrator has

proposed a formula, utilizing an offset-based calculation, that defendants contend would put

plaintiffs in at least as good a position as new hires.  But for the reasons stated above, I find that the

most equitable remedy for defendants' notice violation would be simply to treat both periods of each

plaintiff's employment separately.   Defendants' proposal amounts to yet another offset-based

approach, which the Second Circuit quite clearly disapproved of, with respect to the notice violation.

---

[6]The "*Layaou*" remedy is so-called because it was used in an earlier case against Xerox involving a single plaintiff.  *See Layaou v. Xerox Corp.*, 238 F.3d 205, 209-12 (2d Cir. 2001); *Layaou v. Xerox Corp.*, 330 F.Supp.2d 297 (W.D.N.Y. 2004).  That case eventually settled, in 2005.  *See* 95-CV-6388, Dkt. #116.

737 F.3d at 534.  Plaintiffs have received no notice of any offset, and Xerox's present proposal seems just as faulty as those that have gone before it.

Furthermore, it is self-evident that in fashioning an equitable remedy, the Court should be concerned with balancing the equities; in other words, with fundamental fairness to both sides, which involves determining the extent to which one side or the other should bear the consequences of whatever violations occurred.  *See, e.g.*, *Metro Motors v. Nissan Motor Corp. in U.S.A.*, 339 F.3d 746, 750 (8th Cir. 2003); *Federal Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.,* 813 F.Supp. 234, 235-36 (S.D.N.Y. 1993).  As explained above, it was Xerox that failed to meet its notice obligations under ERISA.  To the extent that one side or the other should suffer the consequences for that violation, it should be Xerox.

I also note that plaintiffs assert that defendants' proposed new-hire remedy would penalize or "punish" plaintiffs for their prior period of service.   Regardless of whether that is a fair characterization of defendants' proposed remedy, I do not believe that it applies to the Court's remedy.  Plaintiffs worked for Xerox for a number of years, they received a benefit (in the form of a lump-sum payment) for their first term of service, and they elected to return to Xerox for a second period of employment.  Treating them as new hires at that point compensates them for all their years of service, and results in neither a penalty nor a windfall.

As a general matter, it is also of no moment to the Court how the individual plaintiffs actually disposed of their initial lump-sum payments.  Presumably, their actions were as varied as the plaintiffs themselves.  A particular plaintiff may have simply spent the money, used it to pay off debts, invested it, or done any number of other things with the money.

But all that is irrelevant to the issue of what equitable relief the Court should direct, to remedy the harm done to plaintiffs.  Whether a plaintiff lost his proverbial shirt or made a killing on the stock market has no bearing on the appropriateness of a new-hire remedy, and need not be taken into account.  Under this approach, every plaintiff will have been fully compensated for *all* years of service.  Plaintiffs will not be penalized by the application of an undisclosed, hypothetical appreciation of the prior payment, nor will they be awarded a double payment for the same period of employment, which they never had any reasonable expectation of receiving.

As stated, in imposing this remedy, the Court is principally guided by the Second Circuit's 2013 remand decision.  That decision must, however, be viewed against the backdrop of the Supreme Court's 2010 decision in this case.

In that regard, I note that the equitable remedy imposed here obviates many of the concerns raised by the Supreme Court's decision.  In particular, Justice Roberts, writing for the majority, took issue with what he viewed as the failure of this Court's prior interpretation of the Plan to account for the time value of money.  *See* 559 U.S. at 519.

The Supreme Court expressed those concerns in the context of plan interpretation, however.  Specifically, the Supreme Court was addressing this Court's failure to apply *Firestone* deference to the plan administrator's then-interpretation of the plan.  *Id.*  Since I find that an equitable remedy is appropriate, there is no need to consider whether to accept, reject or give deference to the plan administrator's current proposed interpretation of the Plan.  *See Frommert*, 738 F.3d at 534.  These matters concerning plan interpretation are therefore moot.

## II. Plaintiffs' Motions

While the above discussion resolves the issues presented by the Court of Appeals' remand of this case, the Court must also address plaintiffs' motions for summary judgment "on the issue of notice and equitable remedies" (Dkt. #267), and for summary judgment on the issue of defendants' bad faith (Dkt. #278).

The latter motion generally concerns whether this Court should give deference to defendants' interpretation of the Plan. Plaintiffs contend that defendants' continuing refusal to pay at least the benefits equivalent to what a "new hire" would receive is evidence of defendants' bad faith, which should strip defendants of any deference that the Court might otherwise give to the administrator's interpretation of the plan. Those issues have been addressed above, and for the reasons stated, this motion is denied, in light of the Court's decision to apply an equitable remedy. The Court's decision does not depend on plan interpretation.

As to plaintiffs' motion concerning notice and equitable remedies, plaintiffs have argued that the remedies of surcharge, reformation and estoppel all entitle plaintiffs to one of three remedies. Plaintiffs contend that under a surcharge theory, they should be given at least the *Layaou* remedy, *i.e.*, offsetting current benefits only by the nominal amount of each plaintiff's prior distribution. Dkt. #267-1 at 13-20. Plaintiffs also argue that surcharge would authorize a so-called "no offset" remedy, as explained below. Dkt. #267-1 at 15.

Plaintiffs go on to argue that reformation also entitles them to either a *Layaou* or "no offset" remedy," and that estoppel entitles them to at least the *Layaou* remedy. Dkt. #267-1 at 17-24. In the alternative, plaintiffs seek what they describe as an "actual annuity" remedy, under which their

benefits would be offset by an amount equal to the annuity that each employee was entitled to upon his or her initial departure from Xerox, *see* Dkt. #267-1 at 26; Dkt. #231 at 7-9.

Regarding the theories of relief, the Court has explained the reasons behind its conclusion that reformation is an appropriate remedy here.  Given that conclusion, I find it unnecessary to reach plaintiffs' arguments concerning the alternative theories of surcharge and estoppel.

As to the particular form of the remedy, the so-called *Layaou* offset is, at bottom, based on plan interpretation.  *See Frommert*, 738 F.3d at 528 (stating that the *Layaou* offset is "so-named because the same offset was used in an earlier decision interpreting the Xerox Plan") (citing *Layaou*, 238 F.3d at 209-12, and *Layaou*, 330 F.Supp.2d 297).  It was that very interpretation that the Supreme Court rejected in this case.

That does not mean that the Court could not impose a *Layaou*-like remedy as a matter of equity.  But I do not find such a remedy appropriate, or at least not as appropriate as a new-hire approach, as a matter of equity.

As stated, I find that since plaintiffs were not adequately notified that their benefits would be offset as a result of their prior distributions, the fairest remedy is simply to dispense with any offset, and to treat their two periods of employment separately.   The *Layaou* remedy, inasmuch as it maintains an offset-based formula, is not as equitable a solution.  At best, it represents an attempt to effectuate the language of the Plan.  That attempt has been roundly rejected by the Supreme Court, inasmuch as it fails to account for the time value of money.

Nor am I persuaded by plaintiffs' arguments in favor of a "no offset" remedy. Apparently what plaintiffs mean by this is that plaintiffs would be given credit for all their years of service, with no deduction at all to account for their initial lump-sum distribution.

Plaintiffs quite accurately characterize this as "a more generous remedy" than the *Layaou* offset. Dkt. #267-1 at 15. Indeed it would be. But it would not be an equitable remedy, in the Court's estimation.

Plaintiffs focus on the Second Circuit's statement that "in the circumstances of this case *any* offset of the RIGP benefit violated ERISA's notice provisions ... ." 738 F.3d at 534. But contrary to plaintiffs' statement in their brief (Dkt. #267-1 at 16), the Court of Appeals was not "*strongly* hint[ing] that the measure of relief here should be no offset at all," and certainly not in the sense that plaintiffs apparently mean, *i.e.*, full benefits for all their years of service, with no account whatsoever taken of their prior lump-sum benefits.

As stated above, the Court of Appeals did find fault with the plan administrator's use of an offset that effectively reduced participants' benefits to a level lower than what plaintiffs would have received had they been "new hires." The fundamental problem with that approach is that plaintiffs were not given adequate notice that this would happen.

Beyond that, however, the Court is not inclined to search for "hints" in the Second Circuit's remand decision. If the Court of Appeals had thought that a no-offset remedy was appropriate, or preferable, it would presumably have said so, in no uncertain terms. The Court instead left it up to this Court to address these matters in the first instance, under this Court's broad, discretionary remedial powers.

In addition, the Court of Appeals has never endorsed an approach, explicitly or otherwise, that would give the plaintiffs in this case a windfall, which is precisely what plaintiffs' "no offset" remedy would accomplish. That approach would compensate plaintiffs twice for the same initial period of service. An equitable remedy should do justice to both sides, not simply confer an undeserved benefit on one side or the other.

After arguing for either the *Layaou* offset, or no offset, under the alternative theories of surcharge, reformation and estoppel, plaintiffs offer one more option, which they describe as an "actual annuity" offset. Under this approach, which plaintiffs have resurrected from a letter from plaintiffs' expert to plaintiffs' then-attorney in 2006, *see* Dkt. #231, the calculation would begin with a plaintiff's original benefit, expressed as an annuity commencing upon retirement, and deduct from that figure the annuity the plaintiff is currently entitled to receive upon retirement.

While plaintiffs characterize this approach as "simple," Dkt. #267-1 at 26, a full understanding of it requires a more detailed explanation than this brief summary. Plaintiffs' expert's description of the formula goes on for several pages. *See* Dkt. #231 at 6-9.

But its relative simplicity, or complexity, is neither a reason to accept nor to reject this approach. This proposed method represents yet another attempt to construe the Plan terms, particularly § 9.6, dealing with non-duplication of benefits. Again, that is unnecessary. And while the Court need not decide whether that construction is a reasonable one, defendants have, with some justification, argued that in making that attempt, plaintiffs' expert undervalued the benefits that plaintiffs received at the time of their initial separation from Xerox. *See* Dkt. #271 at 24-25, #127 at 85-105, #128 at 109-29.

In emphasizing the primacy of an equitable remedy, the Court has attempted to follow the terms of the Second Circuit's mandate. At the same time, however, the Court recognizes that in fashioning an appropriate equitable remedy, I cannot simply ignore the terms of the Plan altogether, at least insofar as those terms were conveyed to plaintiffs. The fundamental question before the Court is how best to ensure that plaintiffs receive what they reasonably could have expected to receive, given defendants' communications to them about the terms of the Plan and the effect that defendants' interpretation and application of those terms would have on plaintiffs' benefits.

An equitable remedy must also take into account the overall background of this case. As the appellate decisions make clear, the overarching problem here is that plaintiffs were not apprised of whether–much less how–their prior distributions would affect their later benefits. Apparently, many plaintiffs had no idea, early on, that their eventual benefits would be as drastically reduced as they were, and Xerox was far from forthcoming in revealing that fact to them.

At the same time, I do not believe that plaintiffs could realistically have expected to get a windfall based on their prior service. They could not reasonably have believed that they would be compensated twice for the same period of service, nor would such a result be fair. The remedy the Court has adopted here strikes a balance between those two considerations, by ensuring that plaintiffs are fully, but not overly, compensated for both their periods of service.

## III. Relief

For the reasons stated above, the Court finds that defendants' notice violations justify the imposition of an equitable remedy, principally under a theory of contract reformation. In its remand

decision, the Court of Appeals left it up to this Court to determine the precise contours of the appropriate remedy.

The obvious starting point is plaintiffs' current benefits.  Those plaintiffs who have retired from Xerox and are currently receiving benefits must have their benefits recalculated, according to the terms of this Decision and Order, and their future payments must be adjusted accordingly.  I see no reason why that adjustment should not be accomplished and put into effect immediately.  As to any plaintiffs who are still working at Xerox, their projected benefits must likewise be recalculated.

But with respect to now-retired employees, merely to recalculate their payments going forward is arguably not enough to remedy defendants' notice violations.  Those violations have caused plaintiffs to suffer harm for some time now, in the form of inequitably low pension benefits.

Thus, for the Court simply to order defendants to begin paying retired plaintiffs an increased benefit would not necessarily compensate those plaintiffs fully for the harm they have suffered.  An additional, lump-sum payment might well be in order, to make up the difference between what plaintiffs have received and what they equitably should have received.

There is also the question of prejudgment interest.  Cases from this circuit make clear that such interest may be included in an award, where appropriate.  *See, e.g., Alfano v. CIGNA Life Ins. Co. of New York*, No. 07 Civ. 9661, 2009 WL 890626, at *6 (S.D.N.Y. Apr. 2, 2009) (holding that successful ERISA plaintiff was entitled to prejudgment interest, since "[f]or more than three years, plaintiff has lacked access to funds to which he was entitled").

"In a suit to enforce a right under ERISA, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court."  *Jones v. UNUM Life*

*Ins. Co. of America*, 223 F.3d 130, 139 (2d Cir. 2000).  *See also Rhodes v. Davis*, __ Fed.Appx. __,

2015 WL 8476732, at *4 (2d Cir. Oct. 10, 2015) (while prejudgment interest is generally mandatory

in breach of contract actions, it is discretionary where the relief granted is equitable in nature);

*Novella v. Westchester County*, 661 F.3d 128, 150 n.25 (2d Cir. 2011) (noting that courts in ERISA

cases can award prejudgment interest "as part of their 'wide discretion in fashioning equitable

relief'") (quoting *Katsaros*, 744 F.2d at 281).

　　　"In exercising such discretion, the court is to take into consideration '(i) the need to fully

compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the

relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other

general principles as are deemed relevant by the court.'"  *Jones*, 223 F.3d at 139 (quoting *SEC v.*

*First Jersey Securities, Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).  *See also Slupinski v. First Unum*

*Life Ins. Co.*, 554 F.3d 38, 54 (2d Cir. 2009) (stating that in an ERISA case in which the plaintiff

prevails, "prejudgment interest is 'an element of [the plaintiff's] complete compensation'") (quoting

*Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989)).

　　　When awarding prejudgment interest, the court must also arrive at an appropriate interest

rate.  The Second Circuit has stated that while the selection of a rate lies within the district court's

"broad discretion," *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996), the district

court must articulate its reasons for choosing a particular rate.  *See, e.g.*, *Rhodes*, 2015 WL 8476732,

at *4; *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 622-23 (2d Cir. 2006); *Jones*, 223 F.3d

at 140.

In the case at bar, the parties have not fully addressed these issues.  Plaintiffs have asked the Court to enter judgment in their favor, and defendants have presented their current interpretation of the Plan, but the relief the Court has ordered here does not conform exactly to either side's requests. In addition, neither side has submitted a concrete, detailed proposal outlining the precise terms of their requested relief.

Before the Court addresses these important questions, then, I would like the parties to weigh in on these matters.  Accordingly, I direct both sides to submit additional papers, as set forth in the Conclusion of this Decision and Order.  *See Curry v. American Int'l Group, Inc. Plan No. 502*, 579 F.Supp.2d 413, 423 (S.D.N.Y. 2008) (granting judgment for ERISA plaintiff, and finding prejudgment interest to be appropriate, but giving the parties additional time to brief the issue of an appropriate prejudgment interest rate).

## CONCLUSION

Pursuant to the December 23, 2013 decision of the United States Court of Appeals for the Second Circuit remanding this case to this Court, defendants are hereby directed to recalculate and pay plaintiffs' retirement benefits, treating plaintiffs' second periods of employment with Xerox as if plaintiffs had been newly hired and without regard for their prior periods of employment, as set forth in detail in the body of this Decision and Order.

Plaintiffs currently employed by Xerox, who hereafter elect to retire and who have previously received retirement benefits for a prior period of employment, shall, upon their retirement, receive retirement benefits consistent with the terms of this Decision.

As to those plaintiffs who are now retired, who have received a lump-sum payment on leaving Xerox previously, and who retired after a second period of employment with Xerox, Xerox shall take steps to immediately recalculate and pay plaintiffs prospectively, effective on the date of this Decision, retirement benefits consistent with the terms of this Decision, that is, with no offset or reduction of any kind on account of benefits received on account of a prior period of employment.

Xerox must also take immediate steps to recalculate and pay currently retired plaintiffs retroactively for the difference in benefits that would have been awarded when plaintiffs retired from Xerox after the second period of employment, had the protocol and procedures set forth in this Decision been utilized at that time, rather than the formula previously utilized by Xerox using the so-called phantom account, or any other procedure previously used by Xerox.

This recalculation for retroactive benefits shall be completed within thirty (30) days of this Decision and Order and a lump-sum check shall be issued to each affected plaintiff, in the amount of the difference in benefits due, within forty-five (45) days of this Decision and Order.

This payment is to be made forthwith, and not delayed simply because a payment of prejudgment interest might also be awarded at some future date. Should such an interest award be made, Xerox shall issue a separate check for that amount as to each affected plaintiff.

Plaintiffs and defendants are directed to file with the Court additional papers as to whether the Court should include an award of prejudgment interest, and if so, what the interest rate should

be.  Plaintiffs should first file within twenty (20) days of this Decision and defendants may respond

within twenty (20) days after the filing of plaintiffs' submission.

Plaintiffs' motion to compel payments of amounts "indisputably due" (Dkt. #254) and their

motions for summary judgment (Dkt. #267, #278) are denied as moot.

The Court reserves decision on plaintiffs' motion for attorney's fees (Dkt. #241) and will

grant plaintiffs leave to file a supplemental motion for attorney's fees within thirty (30) days of entry

of this Decision.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       January 5, 2016.